**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 15-1191

_____

THE ESTATE OF RONALD H. ARMSTRONG, by and through his
Administratrix, Jinia Armstrong Lopez,

Plaintiff - Appellant,

v.

THE VILLAGE OF PINEHURST; OFFICER JERRY MCDONALD, In his
official and individual capacity; OFFICER TINA S. SHEPPARD,
In her official and individual capacity; OFFICER ARTHUR LEE
GATLING, JR., In his official and individual capacity,

Defendants - Appellees,

and

TASER INTERNATIONAL, INC.,

Defendant.

_____

Appeal from the United States District Court for the Middle
District of North Carolina, at Greensboro.   Catherine C. Eagles,
District Judge.   (1:13-cv-00407-CCE-JLW)

_____

Argued: October 28, 2015          Decided: January 11, 2016

_____

Before WILKINSON, KEENAN, and THACKER, Circuit Judges.

_____

Affirmed by published opinion.   Judge Thacker wrote the opinion,
in which Judge Keenan joined.   Judge Wilkinson wrote a separate
opinion concurring in part.

_____

**ARGUED:** Karonnie R. Truzy, CRUMLEY ROBERTS, LLP, Greensboro, North Carolina, for Appellant. Dan McCord Hartzog, CRANFILL SUMNER & HARTZOG LLP, Raleigh, North Carolina, for Appellees. **ON BRIEF:** David J. Ventura, CRUMLEY ROBERTS, LLP, Charlotte, North Carolina, for Appellant. Dan M. Hartzog, Jr., CRANFILL SUMNER & HARTZOG LLP, Raleigh, North Carolina; Michael J. Newman, VAN CAMP, MEACHAM & NEWMAN PLLC, Pinehurst, North Carolina, for Appellees.

---

THACKER, Circuit Judge:

The Estate of Ronald H. Armstrong ("Appellant" when referring to the estate, or "Armstrong" when referring to the decedent) appeals an order granting summary judgment to the Village of Pinehurst, North Carolina, and Lieutenant Jerry McDonald, Sergeant Tina Sheppard, and Officer Arthur Gatling, Jr., of the Pinehurst Police Department ("Appellees"). The district court determined that qualified immunity bars Appellant's claim that Appellees used excessive force when executing an involuntary commitment order, which required Armstrong's immediate hospitalization.

On review, we hold that Appellees used unconstitutionally excessive force when seizing Armstrong, but we, nevertheless, agree with the district court that Appellees are entitled to qualified immunity. We, therefore, affirm the grant of summary judgment in Appellees' favor on the grounds explained below.

I.

We review the district court's grant of summary judgment de novo. See Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). We "determine de novo whether the facts . . . establish the deprivation of an actual constitutional right," Leverette v. Bell, 247 F.3d 160, 166 (4th Cir. 2001), and "[w]e review de novo an award of summary

3

judgment on the basis of qualified immunity," <u>Durham v. Horner</u>, 690 F.3d 183, 188 (4th Cir. 2012). "Summary judgment is appropriate only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, 'no material facts are disputed and the moving party is entitled to judgment as a matter of law.'" <u>Henry</u>, 652 F.3d at 531 (quoting <u>Ausherman v. Bank of Am. Corp.</u>, 352 F.3d 896, 899 (4th Cir. 2003)).

## II.

### A.

Ronald Armstrong suffered from bipolar disorder and paranoid schizophrenia. On April 23, 2011, he had been off his prescribed medication for five days and was poking holes through the skin on his leg "to let the air out." J.A. 675.[1] His sister, Jinia Armstrong Lopez ("Lopez"), worried by his behavior, convinced Armstrong to accompany her to Moore Regional Hospital ("Hospital") in Pinehurst, North Carolina. He willingly went to the Hospital and checked in, but "[d]uring the course of the evaluation he apparently became frightened and eloped from the [emergency department]." <u>Id.</u> Based on that flight and Lopez's report about his odd behavior over the

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

previous week, the examining doctor judged Armstrong a danger to himself and issued involuntary commitment papers to compel his return. Armstrong's doctor could have, but did not, designate him a danger to others, checking only the box that reads "[m]entally ill and dangerous to self" on the commitment form. Id.

The Pinehurst police were called as soon as Armstrong left the Hospital, and three members of the department -- all Appellees in this case -- responded in short order. Officer Gatling appeared on the scene first, followed a minute or two later by Sergeant Sheppard. Lieutenant McDonald arrived about ten minutes after Sheppard. Armstrong had not traveled far when Gatling arrived. He was located near an intersection near the Hospital's main entrance.

When the police arrived, Armstrong's commitment order had not yet been finalized.[2] Therefore, Gatling and Sheppard engaged Armstrong in conversation. By all accounts, the parties were calm and cooperative at this point in time.

---

[2] North Carolina law required that Armstrong's involuntary commitment order be certified in writing and notarized before it took effect. See N.C. Gen. Stat. § 122C-262(b). Police officers are sometimes authorized to seize individuals to prevent them from harming themselves without a commitment order in place, see id. § 122C-262(a), but Appellees did not go that route. Rather, they rely solely on the involuntary commitment order as authorization for their seizure of Armstrong.

Armstrong was acting strangely, however. When Officer Gatling first initiated conversation, Armstrong was wandering across an active roadway that intersects with the Hospital's driveway. Gatling successfully convinced him to withdraw to the relative safety of the roadside, but Armstrong then proceeded to eat grass and dandelions, chew on a gauze-like substance, and put cigarettes out on his tongue while the police officers waited for the commitment order.

As soon as they learned that the commitment papers were complete, the three police officers surrounded and advanced toward Armstrong -- who reacted by sitting down and wrapping himself around a four-by-four post that was supporting a nearby stop sign. The officers tried to pry Armstrong's arms and legs off of the post, but he was wrapped too tightly and would not budge.

Immediately following finalization of the involuntary commitment order, in other words, Armstrong was seated on the ground, anchored to the base of a stop sign post, in defiance of the order. The three police officers at the scene were surrounding him, struggling to remove him from the post. Lopez was in the immediate vicinity as well, along with Jack Blankenship and Johnny Verbal, two Hospital security officers. So Armstrong was encircled by six people -- three Pinehurst police officers tasked with returning him to the Hospital, two

Hospital security guards tasked with returning him to the Hospital, and his sister, who was pleading with him to return to the Hospital.

Appellees did not prolong this stalemate. Nor did they attempt to engage in further conversation with Armstrong. Instead, just thirty seconds or so after the officers told Armstrong his commitment order was final, Lieutenant McDonald instructed Officer Gatling to prepare to tase Armstrong. Officer Gatling drew his taser, set it to "drive stun mode,"[3] and announced that, if Armstrong did not let go of the post, he would be tased. That warning had no effect, so Gatling deployed the taser -- five separate times over a period of approximately two minutes.[4] Rather than have its desired effect, the tasing actually increased Armstrong's resistance.

---

[3] Tasers generally have two modes. "In dart mode, a taser shoots probes into a subject and overrides the central nervous system." Estate of Booker v. Gomez, 745 F.3d 405, 414 n.10 (10th Cir. 2014). Drive stun mode, on the other hand, "does not cause an override of the victim's central nervous system"; that mode "is used as a pain compliance tool with limited threat reduction." Id. (internal quotation marks omitted). Appellees' expert confirmed that the drive stun mode on the TASER X26 ECD that Officer Gatling was carrying is intended to be used for pain compliance rather than incapacitation.

[4] The number of times Armstrong was tased is a disputed fact. But Lopez testified that she saw it happen five times, and because summary judgment was granted in favor of Appellees, this court must accept her version of the facts. See Henry v. Purnell, 652 F.3d 524, 527 (4th Cir. 2011) (en banc).

But shortly after the tasing ceased, Blankenship and Verbal jumped in to assist the three police officers trying to pull Armstrong off of his post. That group of five successfully removed Armstrong and laid him facedown on the ground.

During the struggle, Armstrong complained that he was being choked. While no witness saw the police apply any chokeholds, Lopez did see officers "pull[] his collar like they were choking him" during the struggle. J.A. 192.

With Armstrong separated from the post, Appellees restrained him. Lieutenant McDonald and Sergeant Sheppard pinned Armstrong down by placing a knee on his back and standing on his back, respectively, while handcuffs were applied. But even after being cuffed, Armstrong continued to kick at Sergeant Sheppard, so the police shackled his legs too.

The officers then stood up to collect themselves. They left Armstrong facedown in the grass with his hands cuffed behind his back and his legs shackled. At this point, he was no longer moving -- at all. Lopez was the first to notice that her brother was unresponsive, so she asked the officers to check on him. Appellees did so immediately,[5] but Armstrong's condition

---

[5] It is not clear exactly how long Armstrong was left facedown on the ground after he had been secured. But Lopez conceded that it "happen[ed] pretty quickly really" and that the officers responded "immediately" when asked to check on (Continued)

8

had already become dire.  When the officers flipped him over, his skin had turned a bluish color and he did not appear to be breathing.

Sergeant Sheppard and Lieutenant McDonald administered CPR, and Lieutenant McDonald radioed dispatch to send Emergency Medical Services ("EMS").  EMS responders transported Armstrong to the Hospital's emergency department where resuscitation attempts continued but were unsuccessful.  He was pronounced dead shortly after admission.  According to the Pinehurst Police Department's summary of communications during the incident, just six and one-half minutes elapsed between dispatch advising Appellees that Armstrong's commitment papers were final and Appellees radioing for EMS.

### B.

Based on the foregoing, Appellant filed a complaint in the Superior Court of Moore County, North Carolina, on April 16, 2013.  Appellant sued each police officer involved in Armstrong's seizure, pursuant to 42 U.S.C. § 1983, alleging that the officers used excessive force, in violation of Armstrong's

---

Armstrong.  J.A. 241.  Other witnesses estimated the time as "a couple of seconds" and "15 to 20 seconds."  Id. at 346, 446.

Fourth and Fourteenth Amendment rights, when seizing him.[6] Appellees removed the case to the United States District Court for the Middle District of North Carolina on May 20, 2013.

The district court granted summary judgment to Appellees on January 27, 2015, reasoning, "[i]t is highly doubtful that the evidence establishes a constitutional violation at all, but assuming it does, the defendants are entitled to qualified immunity." Estate of Ronald H. Armstrong v. Village of Pinehurst, No. 1:13-cv-407, slip op. at 4 (M.D.N.C. Jan. 27, 2015) (citation omitted). Appellant filed a timely notice of appeal on February 24, 2015.

III.

A.

"Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir.

---

[6] Appellant's complaint alleges additional causes of action and names additional defendants. But Appellant's brief on appeal presses only one claim: The officers attempting to execute the involuntary commitment order used unconstitutionally excessive force. "Failure to present or argue assignments of error in opening appellate briefs constitutes a waiver of those issues," IGEN Int'l, Inc. v. Roche Diagnostics GmbH, 335 F.3d 303, 308 (4th Cir. 2003), so the excessive force claim is the only matter that remains pending in this appeal. See Fed. R. App. P. 28(a)(8)(A).

2011) (en banc).  A "qualified immunity analysis," therefore, "typically involves two inquiries: (1) whether the plaintiff has established the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation."  Raub v. Campbell, 785 F.3d 876, 881 (4th Cir. 2015).  The court "may address these two questions in 'the order . . . that will best facilitate the fair and efficient disposition of each case.'"  Id. (alteration in original) (quoting Pearson v. Callahan, 555 U.S. 223, 242 (2009)). Appellant's case survives summary judgment, however, only if we answer both questions in the affirmative.  See Pearson, 555 U.S. at 232.

In this case, we adhere to "the better approach to resolving cases in which the defense of qualified immunity is raised," that is, we "determine first whether the plaintiff has alleged a deprivation of a constitutional right at all." Pearson, 555 U.S. at 232 (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998)).  Though this sequence is "no longer . . . regarded as mandatory," it is "often beneficial," and "is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable."  Id. at 236.  Because excessive force claims raise such questions, see Nancy Leong, Improving Rights, 100 Va. L. Rev. 377, 393 (2014) ("[E]xcessive force claims are

11

litigated over 98% of the time in the civil context . . . ."), we exercise our discretion to address the constitutional question presented by this appeal first.

B.

Our initial inquiry, then, is this: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Brosseau v. Haugen, 543 U.S. 194, 197 (2004) (per curiam) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). In this case, the answer is yes. Viewed in the light most favorable to Appellant, the record before us establishes that, when seizing Armstrong, Appellees used unreasonably excessive force in violation of the Fourth Amendment.

A "claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of [a] person" is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." Graham v. Connor, 490 U.S. 386, 388 (1989); see also Scott v. Harris, 550 U.S. 372, 381 (2007). "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." Bell v. Wolfish, 441 U.S. 520, 559 (1979). But the Court has counseled that the test "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the

12

countervailing governmental interests at stake." Smith v. Ray, 781 F.3d 95, 101 (4th Cir. 2015) (quoting Graham, 490 U.S. at 396). There are, moreover, three factors the Court enumerated to guide this balancing. First, we look to "the severity of the crime at issue"; second, we examine the extent to which "the suspect poses an immediate threat to the safety of the officers or others"; and third, we consider "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." Id. (alteration supplied) (quoting Graham, 490 U.S. at 396). "To properly consider the reasonableness of the force employed we must 'view it in full context, with an eye toward the proportionality of the force in light of all the circumstances.'" Id. (quoting Waterman v. Batton, 393 F.3d 471, 481 (4th Cir. 2005)).

1.

Here, the first Graham factor favors Appellant. Appellees have never suggested that Armstrong committed a crime or that they had probable cause to effect a criminal arrest. When the subject of a seizure "ha[s] not committed any crime, this factor weighs heavily in [the subject's] favor." Bailey v. Kennedy, 349 F.3d 731, 743-44 (4th Cir. 2003); see also Turmon v. Jordan, 405 F.3d 202, 207 (4th Cir. 2005) ("[T]he severity of the crime cannot be taken into account because there was no crime." (internal quotation marks omitted)). And this factor

13

would still favor Appellant if Appellees had argued that their seizure was converted to a criminal arrest when Armstrong failed to obey the officers' lawful orders. "Even in a case in which the plaintiff ha[s] committed a crime, when the offense [i]s a minor one, we have found that the first Graham factor weigh[s] in plaintiff's favor . . . ." Jones v. Buchanan, 325 F.3d 520, 528 (4th Cir. 2003) (internal quotation marks omitted).

But we have also recognized that this first Graham factor is intended as a proxy for determining whether "an officer [had] any reason to believe that [the subject of a seizure] was a potentially dangerous individual." Smith, 781 F.3d at 102. And while Armstrong committed no crime, the legal basis of his seizure did put Appellees on notice of two facts that bear on the question of whether Appellees had reason to believe Armstrong was dangerous.

First, as the subject of an involuntary commitment order, executed pursuant to N.C. Gen. Stat. § 122C-262, Armstrong was necessarily considered "mentally ill." See also N.C. Gen. Stat. § 122C-261(a). Armstrong's mental health was thus one of the "facts and circumstances" that "a reasonable officer on the scene" would ascertain. Graham, 490 U.S. at 396. And it is a fact that officers must account for when deciding when and how to use force. See Champion v. Outlook Nashville, Inc., 380 F.3d 893, 904 (6th Cir. 2004) ("It cannot be forgotten

14

that the police were confronting an individual whom they knew to be mentally ill . . . . The diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted."). "The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense." Bryan v. MacPherson, 630 F.3d 805, 829 (9th Cir. 2010) (alteration omitted) (quoting Deorle v. Rutherford, 272 F.3d 1272, 1282-83 (9th Cir. 2001)). "[T]he use of force that may be justified by" the government's interest in seizing a mentally ill person, therefore, "differs both in degree and in kind from the use of force that would be justified against a person who has committed a crime or who poses a threat to the community." Id.

Mental illness, of course, describes a broad spectrum of conditions and does not dictate the same police response in all situations. But "in some circumstances at least," it means that "increasing the use of force may . . . exacerbate the situation." Deorle, 272 F.3d at 1283. Accordingly, "the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis." Id. And even when this ideal course

15

is not feasible, officers who encounter an unarmed and minimally threatening individual who is "exhibit[ing] conspicuous signs that he [i]s mentally unstable" must "de-escalate the situation and adjust the application of force downward." Martin v. City of Broadview Heights, 712 F.3d 951, 962 (6th Cir. 2013).

The second relevant fact that Appellees could glean from Armstrong's commitment order is that a doctor determined him to be a danger to himself.[7] Where a seizure's sole justification is preventing harm to the subject of the seizure, the government has little interest in using force to effect that seizure. Rather, using force likely to harm the subject is manifestly contrary to the government's interest in initiating that seizure. See Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1059 (9th Cir. 2003) (When "a mentally disturbed

---

[7] Armstrong's involuntary commitment order could have issued in order "to prevent harm to self or others," N.C. Gen. Stat. § 122C-262(a) (emphasis supplied), and it is not entirely clear from the record whether reasonable officers at the scene would have known that Armstrong had only been judged a danger to himself or would have thought that a doctor may consider him a danger to others. The officers did, however, speak to Wayne Morton, the behavioral assessment nurse who assisted with preparation of Armstrong's commitment papers, prior to seizing Armstrong. In addition, the officers observed Armstrong for over 20 minutes before the involuntary commitment order was issued. During this period, Armstrong engaged in behavior mildly harmful to himself, but he exhibited no risk of flight or risk of harm to others. Taking these facts in the light most favorable to Appellant, objectively reasonable officers would be aware of the basis underlying Armstrong's commitment order.

16

individual not wanted for any crime . . . [i]s being taken into custody to prevent injury to himself[,] [d]irectly causing [that individual] grievous injury does not serve th[e officers'] objective in any respect.").

The first Graham factor thus weighs against imposition of force. The government's interest in seizing Armstrong was to prevent a mentally ill man from harming himself. The justification for the seizure, therefore, does not vindicate any degree of force that risks substantial harm to the subject.

2.

The second and third Graham factors, whether Armstrong threatened the safety of others and resisted seizure, do justify some -- limited -- use of force, though. Appellees had observed Armstrong wandering into traffic with little regard for avoiding the passing cars, and the seizure took place only a few feet from an active roadway. Armstrong, moreover, fled from the Hospital earlier that day, although he did not go far. Under such circumstances, Appellees concerns that Armstrong may try to flee into the street to avoid being returned to the Hospital, thereby endangering himself and individuals in passing cars, were objectively reasonable. A degree of force was, consequently, justified.

But that justified degree of force is the degree reasonably calculated to prevent Armstrong's flight. When

17

Appellees decided to begin using force, Armstrong, who stood 5'11" tall and weighed 262 pounds, was stationary, seated, clinging to a post, and refusing to move. He was also outnumbered and surrounded by police officers and security guards. The degree of force necessary to prevent an individual who is affirmatively refusing to move from fleeing is obviously quite limited.

Armstrong was also resisting the seizure. There is no question that, prior to being tased, Armstrong was refusing to let go of the post he had wrapped himself around despite verbal instruction to desist and a brief -- **30-second** -- attempt to physically pull him off. Noncompliance with lawful orders justifies some use of force, but the level of justified force varies based on the risks posed by the resistance. See Bryan, 630 F.3d at 830 ("'Resistance,' however, should not be understood as a binary state, with resistance being either completely passive or active. . . . Even purely passive resistance can support the use of some force, but the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance.") And, here, the factual circumstances demonstrate little risk -- Armstrong was stationary, non-violent, and surrounded by people willing to help return him to the Hospital. That Armstrong was not allowing his arms to be pulled from the post and was

18

refusing to comply with shouted orders to let go, while cause for some concern, do not import much danger or urgency into a situation that was, in effect, a static impasse.

3.

When we turn "an eye toward the proportionality of the force in light of all the[se] circumstances,'" Smith, 781 F.3d at 101 (alteration and emphasis supplied) (quoting Waterman, 393 F.3d at 481), it becomes evident that the level of force Appellees chose to use was not objectively reasonable. Appellees were confronted with a situation involving few exigencies where the Graham factors justify only a limited degree of force. Immediately tasing a non-criminal, mentally ill individual, who seconds before had been conversational, was not a proportional response.

Deploying a taser is a serious use of force. The weapon is designed to "caus[e] . . . excruciating pain," Cavanaugh v. Woods Cross City, 625 F.3d 661, 665 (10th Cir. 2010), and application can burn a subject's flesh, see Orem v. Rephann, 523 F.3d 442, 447-48 (4th Cir. 2008) abrogated on other grounds by Wilkins v. Gaddy, 559 U.S. 34, 37 (2010); cf. Commonwealth v. Caetano, 26 N.E.3d 688, 692 (Mass. 2015) ("[W]e consider the stun gun a per se dangerous weapon at common law."). We have observed that a taser "inflicts a painful and frightening blow." Orem, 523 F.3d at 448 (quoting Hickey v.

19

<u>Reeder</u>, 12 F.3d 754, 757 (8th Cir. 1993)). Other circuits have made similar observations.[8] <u>See, e.g.</u>, <u>Estate of Booker v. Gomez</u>, 745 F.3d 405, 414 n.9 (10th Cir. 2014) ("A taser delivers electricity into a person's body, causing severe pain."); <u>Abbott v. Sangamon Cnty.</u>, 705 F.3d 706, 726 (7th Cir. 2013) ("This court has acknowledged that one need not have personally endured a taser jolt to know the pain that must accompany it, and several of our sister circuits have likewise recognized the intense pain inflicted by a taser." (internal citations and quotation marks omitted)); <u>Bryan</u>, 630 F.3d at 825 ("The physiological effects, the high levels of pain, and foreseeable risk of physical injury lead us to conclude that the X26 and similar devices are a greater intrusion than other non-lethal methods of force we have confronted.").

---

[8] Officer Gatling deployed his taser in drive stun mode, which is intended to cause pain but is not intended to cause paralysis. <u>See</u> <u>supra</u> n.3. Our conclusions about the severity of taser use, however, would be the same had he used dart mode. Dart mode, no less than drive stun mode, inflicts extreme pain. <u>See</u> David A. Harris, <u>Taser Use by Law Enforcement: Report of the Use of Force Working Group of Allegheny County, Pennsylvania</u>, 71 U. Pitt. L. Rev. 719, 726-27 (2010) ("I remember only one coherent thought in my head while this was occurring: <u>STOP! STOP! GET THIS OFF ME!</u> Despite my strong desire to do something, all through the Taser exposure I was completely paralyzed. I could not move at all." (emphasis in original)). And the risk of injury is increased because a paralyzed subject may be injured by the impact from falling to the ground. <u>See</u> <u>Bryan</u>, 630 F.3d at 824. Taser use is severe and injurious regardless of the mode to which the taser is set.

These observations about the severe pain inflicted by tasers apply when police officers utilize best practices. The taser use at issue in this case, however, contravenes current industry and manufacturer recommendations. Since at least 2011, the Police Executive Research Forum ("PERF") and the Department of Justice's Office of Community Oriented Policing Services ("COPS") have cautioned that using drive stun mode "to achieve pain compliance may have limited effectiveness and, when used repeatedly, may even exacerbate the situation." PERF & COPS, 2011 Electronic Control Weapon Guidelines, at 14 (March 2011) (emphasis omitted). The organizations, therefore, recommend that police departments "carefully consider policy and training regarding when and how personnel use the drive stun mode[] and . . . discourage its use as a pain compliance tactic." Id. In 2013, moreover, Taser International, the manufacturer of the taser Appellees used in this case, warned, "Drive-stun use may not be effective on emotionally disturbed persons or others who may not respond to pain due to a mind-body disconnect." Cheryl W. Thompson & Mark Berman, Stun guns: 'There was just too much use,' Wash. Post, Nov. 27, 2015, at A1. Taser users, the warning goes on, should "[a]void using repeated drive-stuns on such individuals if compliance is not achieved." Id. Even the company that manufactures tasers, in other words, now warns against the precise type of taser use inflicted on Armstrong.

Force that imposes serious consequences requires significant circumscription. Our precedent, consequently, makes clear that tasers are proportional force only when deployed in response to a situation in which a reasonable officer would perceive some immediate danger that could be mitigated by using the taser. In Meyers v. Baltimore County, we parsed a defendant-officer's taser deployments based on the level of resistance the arrestee was offering -- and the danger that resistance posed to the officers -- when each shock was administered. See 713 F.3d 723, 733-34 (4th Cir. 2013). The "first three deployments of [the] taser did not amount to an unreasonable or excessive use of force[] [because the arrestee] was acting erratically, was holding a baseball bat that he did not relinquish until after he received the second shock, and was advancing toward the officers . . . ." Id. at 733. But seven later deployments of the taser did amount to excessive force:

> It is an excessive and unreasonable use of force for a police officer repeatedly to administer electrical shocks with a taser on an individual who no longer is armed, has been brought to the ground, has been restrained physically by several other officers, and no longer is actively resisting arrest.

Id. at 734. Immediate danger was thus key to our distinction -- tasing the arrestee ceased being proportional force when the

22

officer "continued to use his taser" after the arrestee "did not pose a continuing threat to the officers' safety." Id. at 733.

In Orem v. Rephann, though we were applying a Fourteenth Amendment test rather than the Fourth Amendment's objective reasonableness test, we rejected an officer's argument that the taser deployment in question was intended to prevent an arrestee from endangering herself because the facts belied any immediate danger. See 523 F.3d at 447-49. Rather, those facts -- that "Orem was handcuffed, weighed about 100 pounds, had her ankles loosened in the hobbling device which Deputy Boyles was tightening, and was locked in the back seat cage of Deputy Boyles's car until Deputy Rephann opened the door" -- indicated that "the taser gun was not used for a legitimate purpose[,] such as protecting the officers, protecting Orem, or preventing Orem's escape." Id. As in Meyers, then, we tied permissible taser use to situations that present some exigency that is sufficiently dangerous to justify the force.

Appellees understand these cases to proscribe tasing when a subject has already been restrained but to sanction the practice when deployed against active resistance. Since Armstrong was unrestrained and actively resisting, they contend, their taser use must be permissible.

We disagree. While the questions whether an arrestee has been restrained and is complying with police directives are,

23

of course, relevant to any inquiry into the extent to which the arrestee "pose[s] a continuing threat to the officers' safety," Meyers, 713 F.3d at 733, they are not dispositive. A rule limiting taser use to situations involving a proportional safety threat does not countenance use in situations where an unrestrained arrestee, though resistant, presents no serious safety threat.

Indeed, application of physical restraints cannot be the only way to ensure that an arrestee does not pose a sufficient safety threat to justify a tasing. If it were, use of a taser would be justified at the outset of every lawful seizure, before an arrestee has been restrained. This, of course, is not the law. Courts recognize that different seizures present different risks of danger. See, e.g., Parker v. Gerrish, 547 F.3d 1, 9 (1st Cir. 2008) ("Though driving while intoxicated is a serious offense, it does not present a risk of danger to the arresting officer that is presented when an officer confronts a suspect engaged in an offense like robbery or assault."). Firing a taser "almost immediately upon arrival" at the scene of an altercation, before an officer "could . . . have known what was going on," is, consequently, constitutionally proscribed. Casey v. City of Fed. Heights, 509 F.3d 1278, 1285 (10th Cir. 2007); see also id. at 1286 ("[I]t is excessive to use a Taser to control a target without having any

24

reason to believe that a lesser amount of force -- or a verbal command -- could not exact compliance."). Painful, injurious, serious inflictions of force, like the use of a taser, do not become reasonable simply because officers have authorization to arrest a subject who is unrestrained.

Even noncompliance with police directives and non-violent physical resistance do not necessarily create "a continuing threat to the officers' safety." Meyers, 713 F.3d at 733. Examples of minimally risky physical resistance are prevalent. Refusing to enter an out-of-state officer's police car until a local officer is summoned is not a sufficient threat to the arresting officer to justify physically striking the arrestee. See Rambo v. Daley, 68 F.3d 203, 207 (7th Cir. 1995). Nor is an arrestee pulling her arm away when a police officer attempts to grab her without explanation. See Smith, 781 F.3d at 103. An arrestee "yank[ing] his arm away" from a police officer, similarly, does not justify "being tackled." Goodson v. City of Corpus Christi, 202 F.3d 730, 733, 740 (5th Cir. 2000).

Unsurprisingly, then, other circuits have held that taser use can constitute excessive force when used in response to non-violent resistance. The subject of a seizure "refus[ing] to release his arms for handcuffing," for example, "is no[t] evidence suggesting that [he] violently resisted the officers'

25

attempts to handcuff him." Cyrus v. Town of Mukwonago, 624 F.3d 856, 863 (7th Cir. 2010) (emphasis supplied). Such a refusal, therefore, does not justify deploying a taser when the subject "[i]s unarmed and there [i]s little risk [he] could access a weapon," according to the Seventh Circuit. Id. The en banc Ninth Circuit has drawn a similar conclusion: A suspect "actively resist[s] arrest [when] she refuse[s] to get out of her car when instructed to do so and stiffen[s] her body and clutche[s] her steering wheel to frustrate the officers' efforts to remove her from her car," but when she also "d[oes] not evade arrest by flight, and no other exigent circumstances exist[] at the time[,] . . . [a] reasonable fact-finder could conclude . . . that the officers' use of [a taser] was unreasonable and therefore constitutionally excessive." Mattos v. Agarano, 661 F.3d 433, 446 (9th Cir. 2011) (en banc). The Eighth Circuit agrees as well. See Brown v. City of Golden Valley, 574 F.3d 491, 497 (8th Cir. 2009) (refusal to terminate a telephone call after police ordered an arrestee to do so does not justify tasing even though the police officer was concerned that the arrestee could use glass tumblers near her feet as weapons or could kick the officer).

And this conclusion, that taser use is unreasonable force in response to resistance that does not raise a risk of immediate danger, is consistent with our treatment of police

26

officers' more traditional tools of compliance. We have denied summary judgment on excessive force claims to an officer, who "punched [an arrestee][,] threw him to the ground," and, subsequently, "used a wrestling maneuver" on him, because there was no "real evidence that [a] relatively passive, [mentally delayed] man was a danger to the larger, trained police officer." Rowland v. Perry, 41 F.3d 167, 172, 174 (4th Cir. 1994). In doing so, we rejected the argument that such force was a reasonable response to "the resistance offered by [the arrestee] during the struggle," reasoning that, despite this resistance, the arrestee "posed no threat to the officer or anyone else." Id. at 173-74.

We have similarly held that punching and throwing an arrestee to the ground because she "took only a single step back off of the small stoop in front of the door" and "pulled her arm away" during an attempted handcuffing was excessive force. Smith, 781 F.3d at 102-03. This nominal resistance did not justify the officer's use of force where a reasonable officer at the scene would not have "any reason to believe that [the arrestee] was a potentially dangerous individual" or "was at all inclined to cause [the officer] any harm." Id. at 102.

And we have treated pepper spray, a use of force that causes "closing of the eyes through swelling of the eyelids, . . . immediate respiratory inflammation, . . .

27

and . . . immediate burning sensations," similarly, having held it excessive when used on an arrestee's wife, who was sprinting toward police officers to assist her husband upon seeing him placed in handcuffs. Park v. Shiflett, 250 F.3d 843, 848-49, 852 (4th Cir. 2001). Though the officers at the scene thought running full-bore toward their detainee was basis to arrest the wife for "disorderly conduct[] [and] obstruction of a law enforcement officer in the performance of his duties," id. at 854 n.* (Traxler, J., concurring in part and dissenting in part), we rejected any notion that such behavior justified the application of pepper spray, see id. at 852-83 (maj. op.). Rather, because "[i]t [wa]s difficult to imagine the unarmed [wife] as a threat to the officers or the public," the officers' "irresponsible use of pepper spray twice from close range . . . was indeed excessive." Id.

In all of these cases, we declined to equate conduct that a police officer characterized as resistance with an objective threat to safety entitling the officer to escalate force. Our precedent, then, leads to the conclusion that a police officer may only use serious injurious force, like a taser, when an objectively reasonable officer would conclude that the circumstances present a risk of immediate danger that

28

could be mitigated by the use of force.  At bottom, "physical resistance" is not synonymous with "risk of immediate danger."[9]

Therefore, in the case before us, Appellees' use of force is only "proportional[] . . . in light of all the circumstances," Smith, 781 F.3d at 101 (quoting Waterman, 393 F.3d at 481), if Armstrong's resistance raised a risk of immediate danger that outweighs the Graham factors militating against harming Armstrong.  But when the facts are viewed in the light most favorable to Appellant, they simply do not support that conclusion.

Under these facts, when Officer Gatling deployed his taser, Armstrong was a mentally ill man being seized for his own protection, was seated on the ground, was hugging a post to ensure his immobility, was surrounded by three police officers

---

[9] Graham's test "requires careful attention to the facts and circumstances of each particular case."  Graham, 490 U.S. at 396.  Our holding, therefore, does not rule out the possibility that taser use could be justified in some cases where an arrestee's non-compliance could be described as non-violent. Such a situation would require the existence of facts from which an officer could reasonably conclude that the resistance presents some immediate danger despite its non-violent character.  See Casey v. City of Fed. Heights, 509 F.3d 1278, 1285 (10th Cir. 2007) ("While we do not rule out the possibility that there might be circumstances in which the use of a Taser against a nonviolent offender is appropriate, we think a reasonable jury could decide that [a police officer] was not entitled under these circumstances to shoot first and ask questions later.").

and two Hospital security guards,[10] and had failed to submit to a lawful seizure for only 30 seconds. A reasonable officer would have perceived a static stalemate with few, if any, exigencies -- not an immediate danger so severe that the officer must beget the exact harm the seizure was intended to avoid.

That Armstrong had already left the Hospital and was acting strangely while the officers waited for the commitment order to be finalized do not change this calculus. If merely acting strangely in such a circumstance served as a green light to taser deployment, it would then be the rule rather than the exception when law enforcement officials encounter the mentally ill. That cannot be. By the time Appellees chose to inflict force, any threat had sunk to its nadir -- Armstrong had immobilized himself, ceased chewing on inedible substances, and ceased burning himself. Use of force designed to "caus[e] . . . excruciating pain," Cavanaugh, 625 F.3d at 665, in these circumstances is an unreasonably disproportionate response.

We are cognizant that courts ought not "undercut the necessary element of judgment inherent in a constable's attempts to control a volatile chain of events." Brown v. Gilmore, 278

---

[10] Indeed, it was not the deployment of the taser that ultimately resulted in Armstrong's removal from the post, but rather, the additional aid of the two security guards, who jumped in to assist the three police officers prying him off the post.

30

F.3d 362, 369 (4th Cir. 2002). And we certainly do not suggest that Appellees had a constitutional duty to stand idly by and hope that Armstrong would change his mind and return to the Hospital on his own accord. But the facts of this case make clear that our ruling does not hamper police officers' ability to do their jobs: Tasing Armstrong did not force him to succumb to Appellees' seizure -- he actually increased his resistance in response. When Appellees stopped tasing and enlisted the Hospital's security guards to help pull Armstrong off of the post, however, the group removed Armstrong and placed him in restraints. Had Appellees limited themselves to permissible uses of force when seizing Armstrong, they would have had every tool needed to control and resolve the situation at their disposal.

Appellees, therefore, are not entitled to summary judgment on the question whether they violated the Constitution. Viewing the record in the light most favorable to Appellant, Appellees used excessive force, in violation of the Fourth Amendment.[11]

---

[11] We have reviewed Appellant's additional theories of excessive force but have determined that they lack merit. Those theories are based on Appellees' conduct while handcuffing and shackling Armstrong. Applying "just enough weight" to immobilize an individual "continu[ing] to struggle" during handcuffing is not excessive force. Estate of Phillips v. City of Milwaukee, 123 F.3d 586, 593 (7th Cir. 1997). Appellant
(Continued)

C.

We, nevertheless, affirm the district court's grant of summary judgment in Appellees' favor because we conclude that Appellees are entitled to qualified immunity.

Qualified immunity "shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." Meyers, 713 F.3d at 731. Not all constitutional violations are "violat[ions of] clearly established . . . constitutional rights," id., so "a plaintiff may prove that an official has violated his rights, but an official [may still be] entitled to qualified immunity." Torchinsky v. Siwinski, 942 F.2d 257, 261 (4th Cir. 1991).

The inquiry into whether a constitutional right is clearly established requires first that we define the precise right into which we are inquiring. Because "[t]he dispositive

concedes that Armstrong was resisting Appellees' efforts to restrain him, that Appellees stopped applying force to Armstrong's back when their restraints were secure, and that Armstrong was left in the prone position for a very short period of time after being restrained. Lopez, herself, even placed her foot on Armstrong's leg to assist Appellees' efforts to immobilize Armstrong and apply restraints. In those circumstances, an officer at the scene could conclude that the force used to hold Armstrong down and the length of time Armstrong was left on the ground were objectively reasonable.

32

question is 'whether the violative nature of <u>particular</u> conduct is clearly established,'" <u>Mullenix v. Luna</u>, 136 S. Ct. 305, 308 (2015) (per curiam) (emphasis in original) (quoting <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 742 (2011)), courts must "not . . . define clearly established law at a high level of generality," <u>al-Kidd</u>, 563 U.S. at 742.

After defining the right, we ask whether it was clearly established at the time Appellees acted. A right satisfies this standard when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." <u>Mullenix</u>, 136 S. Ct. at 308 (quoting <u>Reichle v. Howards</u>, 132 S. Ct. 2088, 2093 (2012)).

"This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." <u>Wilson v. Layne</u>, 526 U.S. 603, 615 (1999) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)). "[O]fficials can . . . be on notice that their conduct violates established law even in novel factual circumstances." <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002). But they must, in fact, have notice in order to be held liable.

The constitutional right in question in the present case, defined with regard for Appellees' particular violative

33

conduct, is Armstrong's right not to be subjected to tasing while offering stationary and non-violent resistance to a lawful seizure. Cf. Hagans v. Franklin Cnty. Sheriff's Office, 695 F.3d 505, 509 (6th Cir. 2012) ("Defined at the appropriate level of generality -- a reasonably particularized one -- the question at hand is whether it was clearly established in May 2007 that using a taser repeatedly on a suspect actively resisting arrest and refusing to be handcuffed amounted to excessive force."). While our precedent supports our conclusion that Appellees violated that right when seizing Armstrong, we acknowledge that this conclusion was not so settled at the time they acted such that "every reasonable official would have understood that" tasing Armstrong was unconstitutional. Mullenix, 136 S. Ct. at 308 (quoting Reichle, 132 S. Ct. at 2093).

To be sure, substantial case law indicated that Appellees were treading close to the constitutional line. As discussed, we have previously held that tasing suspects after they have been secured, see Meyers, 713 F.3d at 734;[12] Bailey,

---

[12] Meyers v. Baltimore County was decided after Appellees' conduct in the instant case, but Meyers did not clearly establish any right for the first time. Rather in Meyers, we found that the officer in question violated a right that had been clearly established since, at least, Bailey v. Kennedy, which was decided in 2003. See Meyers, 713 F.3d at 734-35 (citing Bailey, 349 F.3d at 744-45). Appellees in the instant case, therefore, were on notice that tasing an individual who (Continued)

34

349 F.3d at 744-45, and that punching or pepper spraying suspects in response to minimal, non-violent resistance, see Park, 250 F.3d at 849-53; Rowland, 41 F.3d at 172-74, constitute excessive force.

These cases, however, are susceptible to readings which would not extend to the situation Appellees faced when seizing Armstrong. Unlike in Meyers and Bailey, Appellees did not continue using force after Armstrong was secured. See Meyers, 713 F.3d at 734; Bailey, 349 F.3d at 744. And unlike in Park and Rowland, Appellant does not contend the officers in question initiated the excessive force without warning or opportunity to cease any noncompliance. See Park, 250 F.3d at 848; Rowland, 41 F.3d at 171-72. It would not necessarily have been clear to every reasonable officer that those cases applied to force inflicted after warning an individual exhibiting non-violent resistance to desist and discontinued before that individual was secured.

A survey of other circuits' case law confirms that Appellees did not have sufficiently clear guidance to forfeit qualified immunity. Again, there were many decisions that ought to have given Appellees pause. See Bryan, 630 F.3d at 826-27

"was unarmed and effectively was secured" is clearly unconstitutional. Id. at 735.

35

(taser use against individual exhibiting "unusual behavior" and "shouting gibberish[] and . . . expletives" who was "unarmed, stationary . . ., [and] facing away from an officer at a distance of fifteen to twenty-five feet" constitutes excessive force); Cyrus, 624 F.3d at 863 (taser use when misdemeanant was not violent and did not try to flee but resisted being handcuffed constitutes excessive force); Brown, 574 F.3d at 499 ("[I]t was unlawful to Taser a nonviolent, suspected misdemeanant who was not fleeing or resisting arrest, who posed little to no threat to anyone's safety, and whose only noncompliance with the officer's commands was to disobey two orders to end her phone call to a 911 operator.")

But other cases could be construed to sanction Appellees' decision to use a taser. In 2004, the Eleventh Circuit held, "use of [a] taser gun to effectuate [an] arrest . . . was reasonably proportionate to the difficult, tense and uncertain situation" faced by a police officer when an arrestee "used profanity, moved around and paced in agitation, . . . yelled at [the officer]," and "repeatedly refused to comply with . . . verbal commands." Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004)). When reviewing the law as of 2007, moreover, the Sixth Circuit found, "[c]ases from this circuit and others, before and after May 2007, adhere to this line: If a suspect actively resists arrest and refuses

36

to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him." Hagans, 695 F.3d at 509. The Hagans court proceeded to provide examples in which the Sixth Circuit had held tasing reasonable simply because "[t]he suspect refused to be handcuffed" or "the suspect . . . refused to move his arms from under his body." Id. Other circuits, in short, have sometimes distinguished permissible and impermissible tasing based on facts establishing bare noncompliance rather than facts establishing a risk of danger. Because Armstrong was not complying with Appellees' commands, these cases negate the existence of any "consensus of cases of persuasive authority" across our sister circuits "such that a reasonable officer could not have believed that his actions were lawful." Wilson, 526 U.S. at 617.

We conclude, therefore, that Armstrong's right not to be tased while offering stationary and non-violent resistance to a lawful seizure was not clearly established on April 23, 2011. Indeed, two months after Appellees' conduct in this case, one of our colleagues wrote, "the objective reasonableness of the use of Tasers continues to pose difficult challenges to law enforcement agencies and courts alike. . . . 'That the law is still evolving is illustrated in cases granting qualified immunity for that very reason.'" Henry, 652 F.3d at 539-40

37

(Davis, J., concurring) (quoting McKenney v. Harrison, 635 F.3d 354, 362 (8th Cir. 2011) (Murphy, J., concurring)).

D.

This ought not remain an evolving field of law indefinitely though. "Without merits adjudication, the legal rule[s]" governing evolving fields of constitutional law "remain unclear." John C. Jeffries, Jr., Reversing the Order of Battle in Constitutional Torts, 2009 Sup. Ct. Rev. 115, 120. "What may not be quite so obvious, but is in fact far more important, is the degradation of constitutional rights that may result when . . . constitutional tort claims are resolved solely on grounds of qualified immunity." Id. This degradation is most pernicious to rights that are rarely litigated outside the context of § 1983 actions subject to qualified immunity -- rights like the Fourth Amendment protection against excessive force at issue here. See id. at 135-36. "For [such rights], the repeated invocation of qualified immunity will reduce the meaning of the Constitution to the lowest plausible conception of its content." Id. at 120.

Rather than accept this deteriorative creep, we intend this opinion to clarify when taser use amounts to excessive force in, at least, some circumstances. A taser, like "a gun, a baton, . . . or other weapon," Meyers, 713 F.3d at 735, is expected to inflict pain or injury when deployed. It,

38

therefore, may only be deployed when a police officer is confronted with an exigency that creates an immediate safety risk and that is reasonably likely to be cured by using the taser. The subject of a seizure does not create such a risk simply because he is doing something that can be characterized as resistance -- even when that resistance includes physically preventing an officer's manipulations of his body. Erratic behavior and mental illness do not necessarily create a safety risk either. To the contrary, when a seizure is intended solely to prevent a mentally ill individual from harming himself, the officer effecting the seizure has a lessened interest in deploying potentially harmful force.

Where, during the course of seizing an out-numbered mentally ill individual who is a danger only to himself, police officers choose to deploy a taser in the face of stationary and non-violent resistance to being handcuffed, those officers use unreasonably excessive force. While qualified immunity shields the officers in this case from liability, law enforcement officers should now be on notice that such taser use violates the Fourth Amendment.

IV.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

39

WILKINSON, Circuit Judge, concurring in part:

I am happy to concur in the judgment of affirmance and in Part III.C of the majority opinion. Having resolved the case by properly awarding judgment to defendants on qualified immunity grounds, the majority had no need to opine on the merits of the excessive force claim. In fact, it runs serious risks in doing so.

This was a close case, the very kind of dispute in which judicial hindsight should not displace the officers' judgmental calls. I do not contend that the officers' behavior was impeccable here, but I do believe, with the district court, that it was not the kind of action that merited an award of monetary damages.

I.

These are difficult situations. It is undisputed that on April 23, 2011, Armstrong had been off his medications for days and was in an unpredictable and erratic state. J.A. 210-19. It is undisputed that by the time Officer Sheppard arrived at the scene, Armstrong was engaged in self-destructive behavior -- eating grass, dandelions, and gauze, and burning his arms and tongue with cigarettes. Id. at 507-08. It is undisputed that the police obtained an involuntary commitment order to bring Armstrong back to the hospital. Id. at 534. It is undisputed that Armstrong did not want to return to the hospital despite

his sister's pleas to stop resisting authorities. Id. at 231. It is undisputed that Armstrong was a strong man, and weighed about 260 pounds. Id. at 297-98, 411. It is undisputed that before the officers ultimately detained Armstrong they did not have an opportunity to frisk him for weapons. Id. at 464. It is undisputed that the sign post Armstrong gripped was near a trafficked intersection. Id. at 461. It is undisputed that the officers "had observed Armstrong wandering into traffic with little regard for avoiding the passing cars and the seizure took place only a few feet from an active roadway." Maj. Op. at 17. It is undisputed that the officers applied graduated levels of force -- first verbal commands and then a "soft hands" approach -- prior to Officer Gatling's use of his Taser. J.A. 514. It is undisputed that Armstrong tried to kick the officers as they put handcuffs on his legs. Id. at 573. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation" Graham v. Connor, 490 U.S. 386, 396-97 (1989). That pretty much describes the situation here.

II.

Having thoughtfully resolved the appeal on qualified immunity grounds,* the majority launches into an extended discussion on the merits of the excessive force claim. This is so unnecessary. Sometimes it is best for courts not to write large upon the world but to discharge our simple rustic duty to decide the case.

The Supreme Court in Pearson v. Callahan, 555 U.S. 223 (2009), gave us the discretion to do just that. Pearson is admittedly a decision with a bit of back and forth, but its salient contribution was to liberate the lower federal courts from the onerous shackles of the Saucier v. Katz regime and allow them to proceed directly to a qualified immunity analysis without addressing the merits first. In this regard, Pearson recognized the foremost duty of courts to resolve cases and controversies. Id. at 242. That, at least, is what Article III established us to do.

In fact, proceeding in such a manner is often the preferable course. The majority says it must go further in order

---

* Normally, "clearly established" law is found by looking to Supreme Court cases and the cases in the circuit in which the officers are located. See Marshall v. Rodgers, __ U.S. __, 133 S.Ct. 1446, 1450 (2013). My good colleagues range somewhat further afield here, but I think doing so in this case in no way affected the outcome.

to provide clarity in future cases, Maj. Op. at 38-39, but that clarity is often illusory. Today's prescription may not fit tomorrow's facts and circumstances. Our rather abstract pronouncements in one case may be of little assistance with the realities and particulars of another.

As the Supreme Court noted, "the rigid Saucier procedure comes with a price. The procedure sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case. There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Pearson, 555 U.S. at 236-37. So I would respectfully prefer not to get into the first prong of the Saucier analysis here. It is "far from obvious," to use the Court's term, that the trial court's conclusion that "[a]dditional reasonable force was appropriate under these circumstances" was unsound. J.A. 767.

Clarity is arguably most difficult to achieve in Fourth Amendment cases because bright-line rules at most imperfectly take account of the slight shifts in real-life situations that can alter what are inescapably close judgment calls. As the Supreme Court noted,

> Although the first prong of the Saucier procedure is
> intended to further the development of constitutional
> precedent, opinions following that procedure often

fail to make a meaningful contribution to such development. For one thing, there are cases in which the constitutional question is so factbound that the decision provides little guidance for future cases. See Scott v. Harris, 550 U.S. 372, 388 (2007) (BREYER, J., concurring) (counseling against the Saucier two-step protocol where the question is "so fact dependent that the result will be confusion rather than clarity"); Buchanan v. Maine, 469 F.3d 158, 168 (C.A.1 2006) ("We do not think the law elaboration purpose will be well served here, where the Fourth Amendment inquiry involves a reasonableness question which is highly idiosyncratic and heavily dependent on the facts").

Pearson, 555 U.S. at 237.

My fine colleagues in the majority have done as good a job as can be expected given the circumstances. But the very exemplary quality of the effort serves to illustrate the perils of the enterprise. The majority notes "that different seizures present different risks of danger," Maj. Op. at 24, but fails to recognize that the spectrum of risk presented cannot be easily sketched by an appellate court. It is hard to disagree with the majority's highly generalized assertion that Taser use is unwarranted "where an unrestrained arrestee, though resistant, presents no serious safety threat." Id. But of course, what conduct qualifies as "resistant," and what rises to the level of a "serious safety threat" is once again dependent on the actual and infinitely variable facts and circumstances that confront officers on their beat.

44

Tasers came into widespread use for a reason. They were thought preferable to far cruder forms of force such as canines, sprays, batons, and choke-holds, and it was hoped that their use would make the deployment of lethal force unnecessary or at least a very last resort. None of this of course justifies their promiscuous use. The majority "tie[s] permissible taser use to situations that present some exigency that is sufficiently dangerous to justify the force." Maj. Op. at 23. But with all due respect, that abstract formulation will be of less than limited help to officers wondering what exactly they may and may not do.

We are told further that the officers, though armed with a civil commitment order, do not possess the same degree of latitude with regard to a mentally ill person as with someone whom there is reason to believe has committed a crime. Id. at 14-15. All well and good, but the majority then notes that "[m]ental illness, of course, describes a broad spectrum of conditions and does not dictate the same police response in all situations." Id. at 15. Again, what may seem a comforting appellate nostrum is of limited utility to those faced with volatile situations far removed from the peaceful confines of appellate chambers. The majority goes on to note that "in some circumstances . . . increasing the use of force may . . . exacerbate the situation." Id. (internal quotation marks

45

omitted). But what those circumstances are neither my colleagues nor I can really say.

I finally cannot agree that the plaintiff here posed no real danger. He certainly posed a danger to himself having been off medication and engaging in self-destructive behaviors to the point that his sister was pleading for her brother's prompt return to the hospital where he might receive some help. As for the danger to others, it was hardly unlikely that the plaintiff, a sizeable and unrestrained individual, would bolt into the street and cause a traumatic accident for motorists who, if not themselves injured, would regret the harm inflicted on this pedestrian for years to come. I say this not to contend that the case was easy, but that it was hard. The district court rightly recognized that its intrinsic difficulty afforded no reason to deliver these officers an unnecessary rebuke.

### III.

The majority has left it all up in the air. And its approach to this case is not without consequence. The great majority of mentally ill persons pose no serious danger to themselves or others and the challenge of society is to help these good people lead more satisfying lives. A smaller subset of the mentally ill do pose the greatest sort of danger, not only to themselves but to large numbers of people as the string of mass shootings in this country will attest.

46

It is difficult sometimes for even seasoned professionals to predict which is which, not to mention officers and others with more limited training. And yet it is important in this area that law not lose its preventive aspect. It can be heartbreaking to wait until the damage is done. Delivering vague proclamations about do's and don'ts runs the risk of incentivizing officers to take no action, and in doing so to leave individuals and their prospective victims to their unhappy fates. Law enforcement will learn soon enough that sins of omission are generally not actionable. See Deshaney v. Winnebago Cty. Dep't of Social Services, 489 U.S. 189 (1989). And in the face of nebulae from the courts, the natural human reaction will be to desist. Perhaps this is what we mean to achieve, but over-deterrence carries its own risks, namely that those who badly need help will receive no help, and we shall be the poorer for it.