**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 22-1428**

_____

SEAN RAMBERT, SR., Co-Administrator of the Estate of Sean Michael Rambert, Jr.; DANIELLE COX RAMBERT, Co-Administrator of the Estate of Sean Michael Rambert, Jr.,

     Plaintiffs - Appellees,

  v.

CITY OF GREENVILLE; DAVID BRANDON JOHNSON, in his individual and official capacities,

     Defendants - Appellants.

_____

Appeal from the United States District Court for the Eastern District of North Carolina, at Greenville.  Louise W. Flanagan, District Judge.  (4:21-cv-00020-FL)

_____

Argued:  September 20, 2023         Decided:  July 12, 2024

_____

Before THACKER and QUATTLEBAUM, Circuit Judges, and TRAXLER, Senior Circuit Judge.

_____

Reversed in part; dismissed in part and remanded by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Thacker and Senior Judge Traxler joined.

_____

**ARGUED:** Gary S. Parsons, BROOKS PIERCE, Raleigh, North Carolina, for Appellants. Catharine E. Edwards, EDWARDS BEIGHTOL LLC, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Kimberly M. Marston, Amanda S. Hawkins, BROOKS PIERCE MCLENDON HUMPHREY & LEONARD, LLP, Raleigh, North Carolina; Scott D.

MacLatchie, HALL BOOTH SMITH, P.C., Charlotte, North Carolina, for Appellants. Kristen L. Beightol, EDWARDS BEIGHTOL LLC, Raleigh, North Carolina, for Appellees.

―――――――――

QUATTLEBAUM, Circuit Judge:

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). And in applying that principle to a claim that an officer's use of deadly force violates the Fourth Amendment, if the historical facts are sufficiently settled, we have jurisdiction to review a district court's denial of a motion for summary judgment based on qualified immunity. In that situation, whether the officer's conduct was objectively reasonable and whether it violated clearly established law are issues of law for the court. *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007). This appeal involves just that sort of situation.

After Officer David Johnson used deadly force against Sean Rambert, Rambert's estate sued Johnson and the City of Greenville, North Carolina, which operated the police department where Johnson worked. Under 42 U.S.C. § 1983, the estate alleged that Johnson's excessive force and the city's policies and pattern of failing to train and supervise violated Rambert's Fourth Amendment rights. The estate also asserted state law claims of wrongful death, negligence and assault and battery. The defendants moved for summary judgment, arguing that Johnson was entitled to qualified immunity on the Fourth Amendment claims, and that he and the city were entitled to judgment as a matter of law on all other claims. The district court denied Johnson's motion for summary judgment based on qualified immunity, concluding that the record contained genuine disputes of material fact as to the reasonableness of Johnson's conduct and that a jury could resolve factual disputes to conclude that Johnson violated Rambert's constitutional rights by using

3

excessive force based on clearly established law. The court also denied the defendants' motion for summary judgment on the remaining claims.

The defendants appealed, challenging the district court's ruling on qualified immunity and also seeking summary judgment on the Ramberts' other federal and state claims. The Ramberts moved to dismiss the appeal, arguing that we have no jurisdiction to review the qualified immunity issue on an interlocutory basis since the Fourth Amendment claim involves genuine disputes about material facts. And on the merits, they argue the district court did not err in denying summary judgment on any of their claims.

As explained below, the qualified immunity question we face does not involve disputed issues of material fact. Based on this record, it is a question of law for the court. So, we have jurisdiction. And exercising it, we reverse the denial of summary judgment on the § 1983 claim against Johnson predicated on the Fourth Amendment violation, as Johnson is entitled to qualified immunity. We hold that an officer is entitled to qualified immunity from a claim that his use of deadly force violated the Fourth Amendment when he fired at a suspect of a potentially violent crime who, despite repeated commands, charged the officer at full speed and advanced to close proximity to the officer. Such conduct was not objectively unreasonable and, even if it was, did not violate clearly established law. But we decline to exercise jurisdiction over the pendent state law claims and claims against the city. Accordingly, we reverse in part and dismiss in part.

I.[1]

On July 9, 2019, at around 4:00 a.m., an elderly couple reported a breaking-and-entering in progress at their Greenville, North Carolina residence. They reported hearing glass break and a male voice yelling in the background. The police department dispatched two officers to the scene. Johnson was working the night shift and happened to be in the area while on a break. Although Johnson was not dispatched, he heard the call on his radio. To assist, he then drove to the scene and arrived first. He knew that two officers who had been dispatched were five to seven minutes away. And from the dispatch, he knew that a breaking-and-entering was in progress with a report of glass breaking and a yell from a male voice.

Johnson parked his patrol vehicle out of view with his emergency equipment and lights off so that he would not be seen by the intruder. Wearing his Greenville Police Department short sleeve polo shirt and matching pants, he started walking up the sidewalk at about 4:08:35 a.m. J.A. 541–42, Ex. B. Johnson then heard a loud yell of a male voice. In response, he began running toward the sound and activated his body camera.

---

[1] The facts we describe are those the district court found to be undisputed, those that the Ramberts admitted or agreed were undisputed or those that were captured by the video and audio recordings from Johnson's body camera. *See Waterman v. Batton*, 393 F.3d 471, 473 (4th Cir. 2005) (explaining that in reviewing the denial of a motion for summary judgment based on qualified immunity, "we accept as true the facts that the district court concluded may be reasonably inferred from the record when viewed in the light most favorable to the plaintiff"); *Scott*, 550 U.S. at 380–81 (holding that if opposing parties tell two different versions of the facts, and one is blatantly contradicted by the record, a court should not adopt that version of the facts in ruling on a motion for summary judgment).

At about 4:09:00, the loud yelling continued. No words were discernable, just loud screaming. Johnson drew his weapon. At 4:09:02, he issued the first of eight commands to "get on the ground." Although, due to the darkness, Rambert is not yet visible on the video, Johnson spoke into his radio to alert the dispatcher at 4:09:11 that "I've got one running at me." At 4:09:13, Rambert appears on the video running at Johnson while continuing to yell indecipherably.

One second later, at about 4:09:14, Rambert had closed to within a short distance of Johnson. By this time, Johnson retreated from the sidewalk into the street, which was better lit by a streetlight. As Rambert continued to run at him and yell loudly, Johnson fired three shots at Rambert and then another almost immediately after that. Rambert fell forward to the ground. About the same time, Johnson tripped and fell on his back.

Three seconds later, at 4:09:18, Johnson was still on the ground. Rambert was in front of him, only a few feet away, trying to get up and continuing to yell. Rambert rose to his hands and knees and then to a standing position and attempted to advance towards Johnson. Around 4:09:20, Johnson, still on the ground, fired four more shots at Rambert.

The parties dispute whether Rambert made physical contact with Johnson, and the body camera video does not clarify this issue. But the video shows Johnson and Rambert on the ground in the same area, with shadows from their movement very close to one another. The audio captures sounds of their sudden body movements as well as groans, gasps and difficult to decipher words. At about 4:09:31, as the movement and sounds continued, Johnson managed to speak into his radio that shots had been fired. One second later, a flash of Rambert's face appeared above Johnson on the video with the night sky in

6

the background, indicating that Johnson's back was still on the ground and that Rambert was above him. Three seconds later, at 4:09:35, the scuffling sounds continued.

Two seconds later, Johnson and Rambert were still on the ground only a few feet away from each other. At 4:09:39–40, both Johnson and Rambert were trying to get to their feet. As Rambert tried to use his elbow to rise up, Johnson fired two more shots. The last shot knocked Rambert on his back from a sitting position.

At 4:09:42, Johnson had risen to his feet. He trained his gun on Rambert, who had rolled over on the ground with blood around him. At 4:09:48, Johnson began backing away from Rambert then yelled, "show me your hands." He reloaded his weapon but did not shoot. He also radioed for EMS. At 4:10:02, Rambert rolled over and tried again to get up, using his hands and knees to pull himself up. Johnson yelled again at Rambert to "get on the ground right now!" But Rambert still got up and took a few more steps toward Johnson before falling on the ground again. Johnson did not shoot in response to this movement. Rambert collapsed at 4:10:12 but continued to try to get up. At 4:10:25, Rambert sat up briefly before falling backwards and continuing to roll on the ground. At that point, other officers arrived on the scene.

Rambert later died from the gunshot wounds.

## II.

The Ramberts sued Johnson and the City of Greenville, in superior court in Pitt County, North Carolina, asserting violations of civil rights under 42 U.S.C. § 1983 and state law claims. The defendants removed the case to the United States District Court for

7

the Eastern District of North Carolina. After discovery, the defendants moved for summary judgment, arguing that under the undisputed facts, Johnson was entitled to qualified immunity on the Ramberts' Fourth Amendment claims, and that Johnson and the city were, therefore, also entitled to judgment as a matter of law on all other claims.

The district court denied the defendants' motion. It concluded, "[t]aking a reasonable inference in plaintiffs' favor," a reasonable officer could have concluded that Rambert's mental illness was the cause of the conduct referenced by the 911 caller. J.A. 689. The court held that "[t]he facts, viewed in the light proper for this restricted procedural posture, could allow a jury to conclude that even defendant Johnson's initial firing on an unarmed individual conspicuously exhibiting mental instability was a disproportionate use of force in light of all the circumstances, despite Rambert's agitated, running approach." J.A. 694. And the court also determined that the "final uses of deadly force are ones which a reasonable juror could conclude were excessive as they occurred after an unarmed man had been shot at least three times by an officer who had managed to separate himself from the individual and was regaining his footing more quickly than the badly wounded suspect, if the video footage is viewed in the light most favorable to [the Ramberts]." J.A. 697.

The district court next concluded that the law clearly established that a reasonable officer in Johnson's position would have known that firing the final two shots at Rambert was unreasonable. In reaching this conclusion, the court relied primarily on *Waterman v. Batton*, 393 F.3d 471 (4th Cir. 2005) and *Harris v. Pittman*, 927 F.3d 266 (4th Cir. 2019). It explained those decisions had clearly established by the time of this incident that an officer may not use deadly force in the seconds after a serious threat has abated. Thus, the

8

district court denied Johnson's motion for summary judgment based on qualified immunity and similarly rejected the defendants' arguments on the Ramberts' remaining claims.

The defendants appealed, challenging the district court's ruling on qualified immunity and also seeking review of the pendent federal and state law claims. The Ramberts moved to dismiss the appeal, arguing that we have no jurisdiction to review the qualified immunity issue on an interlocutory basis since the district court's decision involved genuine disputes about material facts. And on the merits, they also argue the district court did not err in denying summary judgment.

III.

We first address the Ramberts' motion to dismiss. In that motion, they argue that we lack jurisdiction over this appeal, because, as they contend, the district court based its denial of qualified immunity at the summary judgment stage on disputed facts that must be resolved by the jury. We disagree.

"Under the collateral order doctrine, we have jurisdiction to review a district court's denial of qualified immunity at the summary judgment stage of the proceedings to the extent that the court's decision turned on an issue of law." *Danser v. Stansberry*, 772 F.3d 340, 344–45 (4th Cir. 2014); *see also Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) (holding that a district court's denial of qualified immunity is an appealable "final decision" under 28 U.S.C. § 1291 "to the extent that [the decision] turns on an issue of law"). We lack jurisdiction, however, if the decision was based on questions of evidentiary sufficiency properly resolved at trial. *Danser*, 772 F.3d at 345. Thus, "our first task on appeal is to

9

separate the district court's legal conclusions regarding entitlement to qualified immunity, over which we have jurisdiction, from its determinations regarding factual disputes, over which we do not." *Iko v. Shreve*, 535 F.3d 225, 234 (4th Cir. 2008). And we must also "examine the parties' appellate arguments to ensure that we only consider those legal questions formally raised on appeal." *Id.* at 235.

Here, it is true that the district court denied the defendants' summary judgment motion after concluding that the record contained genuine disputes of material fact. But a review of the court's order makes clear that it believed that the reasonableness of Johnson's conduct—in other words, whether his use of deadly force was justified—was a question of fact to be resolved by the jury. The defendants contend that the court erred in allocating the question of objective reasonableness to the jury. That issue—whether the court or the jury decides the objective reasonableness of the officer's conduct—is a question of law over which we have jurisdiction.

Our view of the district court's order also makes clear that the material facts about what happened in the encounter between Johnson and Rambert—based on the facts the district court found to be undisputed, those the Ramberts admitted were undisputed or did not challenge, and the audio and video recordings from Johnson's body camera—are settled. And as we recently made clear, when the historical facts are settled, the question of the objective reasonableness of officers' conduct is a question of law to be decided by

10

the court.[2] *See Scott*, 550 U.S. at 381 n.1; *see also Armstrong v. Hutcheson*, 80 F.4th 508, 514 (4th Cir. 2023). Thus, the defendants' challenge to the district court's denial of qualified immunity, under this record, is also a legal issue over which we have jurisdiction.

Accordingly, we have jurisdiction over this appeal and deny the Ramberts' motion to dismiss.

IV.

With our jurisdiction established, we turn to Johnson's challenge to the district court's denial of his motion for summary judgment as to the Ramberts' constitutional claims based on qualified immunity.

A.

The Ramberts claim Johnson violated Rambert's Fourth Amendment rights by using excessive force during the July 2019 incident. The Fourth Amendment protects against unreasonable seizures, including the right to be free from seizures made with excessive force. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011). Police officers are "constitutionally permitted to use only that force which is reasonable under the circumstances." *Hupp v. Cook*, 931 F.3d 307, 321 (4th Cir. 2019). "A police officer may

---

[2] In fairness to the district court, there are cases from our Circuit which could be read to indicate that juries rather than judges should determine the reasonableness of Johnson's conduct. But even if we have not been consistently clear about the responsibilities of judges and juries on the issue of objective reasonableness for purposes of qualified immunity in Fourth Amendment cases, the Supreme Court has. In *Scott*, it held the question of reasonableness of the officer's action, in other words, whether the actions have risen to the level of deadly force, is a "pure question of law." 550 U.S. at 381 n.8.

use deadly force when the officer has sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). But deadly force in the absence of such a threat is unreasonable. *Id.*

Whether the force use was reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The "reasonableness" of a particular use of force must be judged from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* The "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. The "objective standard adequately protects an officer who acts in good faith." *Kingsley v. Hendrickson*, 576 U.S. 389, 399 (2015).

## B.

In response to the Ramberts' Fourth Amendment claim, Johnson contends he is protected under the doctrine of qualified immunity. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle*, 566 U.S. at 664. "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need

12

to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The protection applies regardless of whether the government official's error is a mistake of law, a mistake of fact or a mistake based on mixed questions of law and fact. *Id.* It gives "government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (internal quotes and citation omitted). While qualified immunity doctrine is a defense to liability, it is also intended to free officials from litigation concerns and disruptive discovery. *Ashcroft v. Iqbal,* 556 U.S. 662, 685 (2009). That is why a court decision denying a claim of qualified immunity is within a narrow class of orders appealable even without a final judgment. *Id.* at 671-72.

But an officer is not entitled to "qualified immunity if he or she deprived an individual of a constitutional right and that right was clearly established at the time of the violation." *Hupp*, 931 F.3d at 317. A government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear such that "every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

In reviewing a district court's denial of qualified immunity, we conduct a two-pronged analysis. First, we analyze whether the plaintiff has established that "a constitutional violation occurred." *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010). The plaintiff bears the burden of proof on this question. *See Stanton v. Elliott*,

13

25 F.4th 227, 233 (4th Cir. 2022). Second, we consider whether the right at issue was "clearly established" at the time of the events in question. *Id.* The officer bears the burden on this second prong. *Id.*

C.

While courts have discretion to begin with either prong of the qualified immunity analysis, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), we start by examining whether Johnson's conduct was objectively reasonable. Recall that this issue, if the historical facts are sufficiently settled, is a question of law. *Armstrong*, 80 F.4th at 514.

At the summary judgment stage, "courts must view the evidence in the light most favorable to the nonmoving party. . . ." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (internal quotes and citation omitted). Our consideration of the qualified immunity question does not "override the ordinary rules applicable to summary judgment proceedings." *Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005); *see also Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 579–80 (4th Cir. 2017) ("In this procedural posture, we may not credit defendant's evidence, weigh the evidence, or resolve factual disputes in the defendants' favor."). Even so, there is a twist in cases like this one where the record contains a videotape of the events in question. In that situation, we cannot accept the plaintiff's version of the facts when they are contradicted by a videotape. In that situation, we "view[] the facts in the light depicted by the videotape." *Scott*, 550 U.S. at 381.

14

1.

Here, the undisputed facts as cataloged by the district court, as well as the audio and video from Johnson's body camera provide historical facts that bear on the objective reasonableness of Johnson's conduct in at least eight ways. First, Johnson was alone in the dark, responding to a reported in-progress breaking-and-entering after the homeowner reported hearing glass break and a male voice. So, a reasonable officer approaching the scene would have known that a potentially dangerous crime was in process with imminent threat to the people in the home. Such an officer would also know that a glass break during a breaking-and-entering could result from the use of some sort of weapon to gain entry.

Second, as he approached the home, Johnson heard a male voice yelling. Remember that he also knew from the dispatch report that the residents who reported the breaking-and-entering had also mentioned hearing a man yelling. A reasonable officer may not have known if the yelling was from the suspect, a victim or someone else but could have viewed the yelling as additional evidence of danger.

Third, after seeing Rambert running towards him continuing to yell, Johnson ordered Rambert to get on the ground. Although Johnson repeated this command eight times, Rambert never complied. Instead, he kept running directly at Johnson while yelling. A reasonable officer could have viewed this noncompliant and charging potential suspect as an imminent threat.

Fourth, Johnson retreated from the sidewalk into the street. But as Johnson backed away, Rambert continued to charge. Johnson did not shoot until Rambert ignored his eight commands to get on the ground and had moved close to Johnson. A reasonable officer

15

could have believed that a man running at him from the site of a suspected breaking-and-entering who ignored commands to get on the ground and had closed to within a few feet posed an imminent threat to the officer.

Fifth, after the initial shots, Johnson tripped and fell backwards. Johnson was on the ground with Rambert in close proximity. Despite falling to the ground after Johnson's initial shots, Rambert rose to a standing position and moved toward Johnson, who remained on the ground. At that point, a reasonable officer could have believed the threat posed by Rambert had not passed. To the contrary, a reasonable officer could have thought that his shots either missed Rambert or did not abate the threat he posed.

Sixth, after Johnson's initial shots, Rambert continued to move toward Johnson. While Johnson claims Rambert grabbed his leg, the video does not confirm or refute physical contact. But it shows that Rambert was very close to Johnson, at one point over him, with Johnson still on the ground. And the audio contains sounds of body movements and groans and gasps. Again, based on Rambert's continued advancement, a reasonable officer could have believed that the threat Rambert posed had not subsided.

Seventh, before Johnson's final shots, the video reveals that Johnson achieved some separation from Rambert. But they remained within a few feet of each other and on the ground. Both tried to get up. Johnson rose up from his back but had not managed to get to his feet. Rambert tried to use his elbow to rise up. At this point, a reasonable officer could have thought that Rambert continued to pose a threat. And only about 25 seconds elapsed from Johnson's first shot until the last. During that time, Johnson was either on the ground

16

or trying to get up, and Rambert was also on the ground in close proximity either moving towards Johnson or trying to raise up.

Eighth, once Johnson managed to get on his feet, he backed away from Rambert. Even then, Rambert continued to try to get up and move toward him. Yet Johnson did not fire his weapon again.

With those historical facts and their impact on what a reasonable officer in Johnson's shoes would have done, we return to the *Graham* factors. "[T]he severity of the crime at issue" was high. *Graham*, 490 U.S. at 396. Johnson encountered Rambert in responding to a 911 call about a breaking-and-entering with a glass break, which, to a reasonable officer could suggest the possible use of a weapon. And Rambert's highly aggressive pursuit of Johnson, both before and after Rambert was shot, placed Johnson in imminent danger. *Id.* Also, for the reasons already stated, Rambert "pose[d] an immediate threat to the safety of the officer[]." *Id.* Last, Rambert was "actively resisting arrest or attempting to evade arrest." *Id.* He ignored eight commands to get on the ground and charged at the lone officer on the scene instead.

To be sure, Rambert had the right under the Fourth Amendment to be free from excessive force. But an officer's use of deadly force in response to an obvious, serious and immediate threat to his safety is not excessive. *See Elliott*, 99 F.3d at 643 ("The Fourth Amendment does not require police officers to wait until a suspect shoots to confirm that a serious threat of harm exists."). Even construing the evidence in the light most favorable to the Ramberts, Rambert posed an obvious, serious and immediate threat to Johnson. At the time of each of Johnson's shots, a reasonable officer would have viewed that threat as

17

continuing. As a result, the force Johnson used was not excessive, and his conduct was not objectively unreasonable.

2.

Resisting this conclusion, the Ramberts argue that Johnson's conduct was unreasonable when the facts are viewed in the light most favorable to them. They argue that the record shows that Rambert was unarmed and experiencing a mental health episode. As a result, they insist that Johnson should have holstered his gun and used pepper spray to subdue Rambert. It is true that Rambert was not brandishing a weapon and, in fact, did not even possess one. But Johnson did not know whether Rambert was or was not armed when Rambert charged at him, at which point Johnson had mere seconds to judge the risk and determine how to respond to Rambert's aggressive and non-compliant approach. In these circumstances, Rambert's lack of a weapon did not make Johnson's use of force unreasonable. *See McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994) ("[W]e do not think it wise to require a police officer, in all instances, to actually detect the presence of an object in a suspect's hands before firing on him."). Also, there was a known weapon at the scene, Johnson's gun. For all Johnson knew, Rambert could have been rapidly and aggressively approaching Johnson to try to take it.

Nor did any mental health episode Rambert might have been experiencing make Johnson's use of force unreasonable. First, we question whether the record supports the Ramberts' argument that Johnson knew Rambert was experiencing the effects of a mental illness. No one—not the homeowner, police dispatcher, Rambert or anyone else—told or insinuated to Johnson that Rambert was in the midst of a mental health episode. But even

18

if Rambert were in mental distress, he was a potential breaking-and-entering suspect who charged at Johnson at full speed while yelling and ignoring Johnson's commands to get on the ground, ultimately reaching a proximity where he might have been able to grapple with Johnson and seize his gun. And Rambert continued to advance aggressively even after being shot by Johnson. Whether or not he was experiencing the effects of mental illness, Rambert posed an imminent threat to Johnson. And with respect, the Ramberts' argument that Johnson should have holstered his gun and used pepper spray in response to Rambert's conduct defies the reality of the situation. "Th[e] suggestion that the officer[] might have responded differently is exactly the type of judicial second look that the case law prohibits." *Elliott,* 99 F.3d at 643.

The Ramberts also argue that Johnson cannot justify his use of force because the videotape does not clarify whether Rambert ever made physical contact with Johnson. That characterization of the videotape is fair. But whether Rambert made physical contact with Johnson is not material considering the other undisputed evidence. Even if Rambert did not touch Johnson, he charged at him while yelling and ignoring Johnson's commands to get on the ground. And after falling to the ground following his initial shots, Johnson was either lying on his back or trying to get up when he fired the remaining shots. Also, even after the first and second rounds of shots, Rambert continued to advance towards Johnson. Indeed, Rambert was close to Johnson and at one point above Johnson while Johnson was lying on his back. So, the undisputed evidence shows that Rambert remained a threat whether or not he physically touched Johnson.

19

Last, the Ramberts argue that by the time Johnson fired the final two shots, Rambert no longer posed a threat. According to the Ramberts, at that time, Johnson had separated from Rambert and had wounded him with the prior shots. But the videotape makes clear that, although both were trying, neither Johnson nor Rambert had been able to get to their feet. Throughout the encounter, Rambert ignored Johnson's commands and continued to move towards him even after being shot. A reasonable officer could have perceived that Rambert remained a threat.

Finally, the last shots were fired only about 25 seconds after the first. There was no break during that sequence. During those seconds, Johnson was either on the ground or trying to get up, and Rambert was, at most, feet away and trying to move towards him. Johnson was forced to make split-second decisions in the midst of Rambert's pursuit.

To repeat, when the historical facts are sufficiently settled, as they are here, the officer's reasonableness is a question of law for the court. And addressing that question, the Ramberts have failed to show a Fourth Amendment violation. Thus, under prong one of our analysis, Johnson is entitled to qualified immunity.

## D.

Also, even if the Ramberts had established that Johnson violated Rambert's Fourth Amendment rights—which he did not—Johnson would still be entitled to qualified immunity under the second prong of our analysis. Under that prong, an officer is entitled to qualified immunity if, at the time of the challenged conduct, the law did not clearly establish that the officer's conduct was unconstitutional. *See District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018).

20

Qualified "immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 9, 12 (2015) (per curiam)). To carry out this purpose, the way in which an alleged right is described matters. To assess whether a right is clearly established, we must not define the right at too high a level of generality. *Id*. at 79. "Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* (cleaned up). The Supreme Court has stressed the need to "identify a case" or a "body of relevant case law" where "an officer acting under similar circumstances . . . was held to have violated the [Constitution]." *Wesby*, 583 U.S. at 64 (cleaned up); *see also Pauly*, 580 U.S. at 79 ("[T]he clearly established law must be 'particularized' to the facts of the case.").[3]

### 1.

The Ramberts claim that, at the time of the encounter here, the law clearly established that Rambert had a constitutional right to be free from deadly force once the danger he posed had passed. This description, however, is too general. In fact, it is the type of outcome-determinative generality the Supreme Court has made clear is improper, particularly in excessive force cases. *See City of Escondido v. Emmons*, 139 S. Ct. 500, 503

---

[3] To be sure, some misconduct is so flagrant that the plaintiff need not point to a case precisely on point to demonstrate that an officer was on notice that their conduct violated the law. *See, e.g.*, *Hope v. Pelzer*, 536 U.S. 730, 745 (2002); *Taylor v. Riojas*, 592 U.S. 7, 9 (2020). But this case certainly does not present such a situation.

21

(2019) (per curiam) ("This Court has repeatedly told courts… not to define clearly established law at a high level of generality." (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam))). To be clearly established, there must be case law finding that conduct similar to Johnson's was unconstitutional. As the defendants point out, at the time of the encounter between Rambert and Johnson, no case nor body of law clearly established that conduct similar to that of Johnson was unreasonable.

In fact, our precedent, if anything, supports the opposite. In *Sigman v. Town of Chapel Hill*, 161 F.3d 782 (4th Cir. 1998), we affirmed the district court in finding that a police officer who fatally shot an individual during a standoff was entitled to qualified immunity based on his actions during the encounter. There, officers responded to a 911 call in connection with a domestic dispute between a woman and her boyfriend, Sigman. The officers knew that Sigman had a knife, was drunk and was enraged. During the standoff, Sigman continued to walk toward one of the officers holding the knife in a threatening manner. When Sigman was about 10 to 15 feet away and continuing to approach him, the officer shot him twice. We explained that "[w]here an officer is faced with a split-second decision in the context of a volatile atmosphere about how to restrain a suspect who is dangerous, who has been recently—and potentially still is—armed, and who is coming towards the officer despite officers' commands to halt, we conclude that the officer's decision to fire is not unreasonable." *Id.* at 788. Rambert's conduct was

22

comparable to that of Sigman. Like the officer in *Sigman*, Johnson is entitled to qualified immunity.[4]

The Ramberts disagree. They rely mainly on four cases to argue that, at the time of this incident, the law clearly established that Johnson's conduct violated the Fourth Amendment. They first point to *Clem v. Corbeau*, 284 F.3d 543 (4th Cir. 2002), where we affirmed the denial of qualified immunity on an excessive force claim in a case in which officers shot a 58-year-old man suffering from dementia, depression and various physical problems. The officers responded to a phone call to the police department by the man's wife, who was seeking help for the man because he was acting out of character. We said that, on the facts presented there, the law in November 1998 provided clear guidance that a citizen perceived to be unarmed and not dangerous, who was not suspected of any crime nor fleeing a crime scene, had a right to be free from the use of deadly force absent a belief by the officer that he posed a threat of serious physical harm. *Id.* at 553–54. But *Clem* is

---

[4] Johnson also points to a few out-of-circuit cases for the proposition that a rapidly approaching person can constitute a sufficient threat to justify an officer's use of deadly force. *See Carswell v. Borough of Homestead*, 381 F.3d 235, 238 (3d Cir. 2004) ("A reasonable officer would not be expected to take the risk of being assaulted by a fleeing man who was so close that he could grapple with him and seize the gun."); *Wenzel v. City of Bourbon*, 899 F.3d 598, 602 (8th Cir. 2018) ("Given his knowledge of that reputation and the scant three seconds that he had to observe Wenzel's unabated approach towards him, it was reasonable for Storm to believe that Wenzel posed an immediate threat of serious physical harm to him, notwithstanding the fact that Storm could see that Wenzel's hands were empty and the later-discovered fact that Wenzel was unarmed."); *Guerra v. Bellino*, 703 F. App'x 312, 317 (5th Cir. 2017) ("The eyewitness video shows Guerra charging toward Bellino immediately before the shooting. We may determine in hindsight that Guerra posed no threat, but such a determination is of no consequence to the analysis. Guerra's cooperation prior to the point at which he charged Bellino is immaterial.") (internal citation omitted).

nowhere close to this case. Johnson was not responding to a mental health call, and he knew nothing about the breaking-and-entering suspect he was to encounter, aside from knowledge of the glass break and a witness recounting of a male voice. Although he may not have perceived Rambert to be armed, he perceived him to be dangerous, a threat of serious physical harm and a breaking-and-entering suspect. *Clem* would not put Johnson on notice that he was violating Rambert's clearly established Fourth Amendment rights at the time of the events in question.

The Ramberts also rely on *Estate of Armstrong v. Village of Pinehurst*, 810 F.3d 892 (4th Cir. 2016). That case stands for the proposition that police tactics to be employed against an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those tactics to be used to subdue an armed and dangerous criminal who has recently committed a serious offense. *Id.* at 900. There, the police responded to assist with a hospital discharge of a man suffering from bipolar disorder and paranoid schizophrenia and ultimately used a taser to gain the man's compliance. We concluded that, going forward, where "during the course of seizing an out-numbered mentally ill individual who is a danger only to himself, police officers choose to deploy a taser in the face of stationary and non-violent resistance to being handcuffed, those officers use unreasonably excessive force." *Id.* at 910.

But unlike the individual in the *Estate of Armstrong*, Rambert was not "minimally threatening," *id.* at 900, and he was not engaging in "stationary and non-violent resistance," *id.* at 909. He was persistently aggressive toward Johnson, and he was a suspect in a breaking-and-entering. Also, while perhaps Rambert was experiencing a mental health

24

episode, a reasonable officer in Johnson's position would not have known this. And even if Johnson had known or reasonably suspected a mental health episode, his force was not excessive in light of Rambert's aggressive and violent actions. No precedent from our Court or the Supreme Court requires an officer to refrain from deadly force when faced with a suspect's aggressive and violent actions because of the possibility that the suspect may be suffering from mental health issues. So, *Estate of Armstrong* does not clearly establish that Johnson's conduct violated Rambert's constitutional rights.

Neither does *Wilson v. Prince George's County,* 893 F.3d 213 (4th Cir. 2018). There, Wilson was shot several times during an encounter with a police officer who was investigating an emergency call that Wilson had burglarized his former girlfriend's dwelling and assaulted her. We concluded that it was not clearly established in October 2012 that "shooting an individual was an unconstitutional use of excessive force when: (1) the officer had probable cause to believe that the person had committed certain misdemeanors, one of which involved the use of force against another person; (2) the individual was standing about 20 feet from the officer holding a knife and using it to hurt himself, but was not threatening anyone or making any sudden movements; and (3) the individual had ignored the officer's repeated commands to drop the knife." *Id.* at 222. In so concluding, we considered cases, such as *Clem* and *Sigman*, where officers encountered individuals who were suicidal or experiencing mental illness, but we did not find those cases dispositive in terms of providing notice of clearly established law to the officer in *Wilson*. Even so, we held that "as of the date this opinion issues, law enforcement officers are now on notice that such conduct constitutes excessive force in violation of the Fourth

25

Amendment." *Id.* at 224. But this case would not place a reasonable officer in Johnson's position on notice that his conduct violates the Fourth Amendment. Rambert ran suddenly and directly toward Johnson. His movements and yelling were threatening. And he kept advancing toward Johnson prior to and after being shot. *Wilson* does not support the Ramberts' clearly established argument.

Last, the Ramberts rely on a recent unpublished but argued opinion, *Bygum v. City of Montgomery*, No. 21-2130, 2023 WL 2203591 (4th Cir. Feb. 24, 2023). There, an officer tried to apprehend a suspect, Bygum, for committing several non-violent misdemeanors, such as shouting obscenities, attempting to break into a patrol car, trying to evade arrest and obstructing justice. He shot Bygum after a foot pursuit. The officer did not know if Bygum had a weapon but, when he opened fire, Bygum was empty-handed, stationary and 50 feet away. Bygum had also acted erratically and had failed to comply with commands. At one point, Bygum allegedly acted as if he was going to lunge at the officer but was otherwise evasive. We affirmed the district court's denial of the officer's motion for summary judgment on qualified immunity, holding that *Clem* and *Wilson* provided the officer with fair warning that shooting a stationary, empty-handed suspect attempting to evade arrest was unconstitutional under the circumstances. But like the other cases Rambert presents, *Bygum* does not help his argument. To repeat, Rambert was a suspect of a dangerous crime and actively charged at Johnson, continuing to advance toward him and ignore his commands during the entire episode. *Bygum* did not put Johnson on clear notice that his conduct violated Rambert's rights.

26

2.

The Ramberts also argue that the law even more clearly established that Johnson's last two shots violated Rambert's constitutional rights. About 16 seconds elapsed between Johnson's eighth shot and the final two shots. And the Ramberts point out that, by that time, the videotape shows that Johnson managed to put some distance between himself and Rambert. The Ramberts insist, at the time of that limited separation, any threat Rambert may have posed had ceased.

In support of that argument, the Ramberts rely on *Harris v. Pittman*, 927 F.3d 266, 269 (4th Cir. 2019); *Brockington v. Boykins*, 637 F.3d 503, 507 (4th Cir. 2011); and *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005). And to be sure, those cases hold that "even where deadly force initially is justified by a significant threat of death or serious physical injury, a police officer may not continue to employ deadly force when the circumstances change so as to eliminate the threat." *Harris*, 927 F.3d at 281. But these cases do not change the analysis here.

Take *Waterman*. It involved officers' pursuit of Waterman, who refused to pull over his vehicle after an officer attempted to stop him for speeding. Certain officers positioned themselves at a toll plaza in the direction Waterman was driving. With Waterman's vehicle lurching and accelerating toward them, the officers shot at Waterman as he drove past them at the toll plaza. They continued shooting at him after his vehicle passed them. We held that while the initial shooting might have been justified by the threat of physical harm that Waterman posed while accelerating toward the officers, that threat no longer existed after his vehicle had passed the officers. But here, the video shows that

27

before the last shots, the danger had not dissipated. In the seconds before Johnson's last two shots, Rambert continued to try to get up. The video shows them in close proximity during this time and, at one point, Johnson is on the ground with Rambert over him. Also, the audio captures the sound of sudden body movements on the ground and groans and gasps from both Rambert and Johnson. And even though Johnson eventually managed to separate from Rambert, they were still within a few feet of each other as Rambert attempted to get up, as he had been doing during the entire episode.

Next, in *Brockington*, Brockington and an officer encountered each other in close range on the back steps of a residence. The officer fired his handgun twice at Brockington, causing him to fall down the stairs. While Brockington lay on his back on the ground, unable to defend himself, the officer stood over him. The officer then fired at least six more shots at close range, permanently paralyzing Brockington. Brockington conceded that the officer's initial shots were reasonable but argued that shooting him multiple times after he was already immobilized constituted excessive force. We agreed. We held that "[t]here is no indication that deadly force was necessary or reasonable once Brockington was initially shot, thrown to the ground by the force of the bullets, and wounded." *Brockington*, 637 F.3d at 507. And we explained, between the initial shots and the last shots, "there was a clear break in the sequence of events." *Id*. *Brockington* is very different from our case. Prior to Johnson firing his last shots, Rambert was not lying on his back defenseless like Brockington. In fact, Rambert was trying to get up as he had done previously in trying to advance towards Johnson. Also, while the officer stood over Brockington "execution style," *id*., Johnson was on the ground, still in a vulnerable position. Finally, the 16 or so

28

seconds between the shots was not a clear break in the sequence. While the videotape does not clarify exactly what took place during those few seconds, it does make clear that Johnson and Rambert were both on the ground in very close proximity. And the audio makes clear that they were moving around on the ground and groaning and gasping. The encounter remained intense and dynamic.

Last, in *Harris*, after a violent, hand-to-hand struggle for control of the officer's gun, Harris initially wrested the gun away from the officer. *Harris*, 927 F.3d at 268–69. He attempted to fire at the officer, but the gun did not go off. After that, the officer regained control of the gun. He shot Harris. *Id*. at 269. According to Harris, the shot hit him in the chest, lifted him off the ground and caused him to fall to the ground bleeding and badly wounded. *Id*. at 270. Harris alleged that the officer then stood over him while he lay defenseless on the ground and fired the final shots. *Id.* We held that, based on Harris' description of the evidence, "at least once he regained his footing and stood over Harris with his gun," the officer would have realized that Harris was "badly wounded and subdued." *Id.* at 275. Like *Waterman* and *Brockington*, *Harris* would not have put Johnson on notice that his conduct violated Rambert's clearly established Fourth Amendment rights. At the time of the final shots, Johnson had not regained his footing. He was not standing over Rambert. And Rambert was not lying badly wounded and subdued. To the contrary, Rambert continued to try to rise up to advance towards Johnson. In sum, the case law as of July 9, 2019, did not put the constitutional question beyond debate.

3.

Finally, the Ramberts argue that even if none of the cases they cite independently clearly establishes that Johnson violated Rambert's Fourth Amendment rights, collectively they do. But that is not how the clearly established prong of qualified immunity works. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Mullenix*, 577 U.S. at 12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). To show that an officer is "plainly incompetent" or "knowingly violate[s] the law," there must be precedent that establishes that conduct factually similar to that officer's conduct is unconstitutional. *Id.* Police officers "*are* entitled to qualified immunity *unless* existing precedent 'squarely governs' the specific facts at issue." *Kisela*, 138 S. Ct. at 1153 (emphasis added) (quoting *Mullenix*, 577 U.S. at 12). The "clearly established" analysis requires consideration of specific and similar circumstances. *White*, 580 U.S. at 79 ("The panel majority misunderstood the 'clearly established' analysis: It failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment."). The Ramberts' arguments seek to mix and match principles of dissimilar cases to form nonexistent authority. This approach flies in the face of established Supreme Court precedent.

V.

To conclude, the defendants' arguments on appeal involve the legal issues of the objective reasonableness of Johnson's conduct and his entitlement to qualified immunity. Since we have jurisdiction over those issues, we deny the Ramberts' motion to dismiss this appeal. And as to the merits of the appeal, Johnson is entitled to qualified immunity on the

30

Ramberts' excessive force claim. Thus, we reverse the district court's order denying

summary judgment as to this claim. Last, we dismiss the appeal as to the portion of the

district court order denying summary judgment on the related state and federal claims and

as to the claims against the City of Greenville.[5] We remand for proceedings consistent with

this opinion.

*REVERSED IN PART; DISMISSED IN PART AND REMANDED*

---

[5] Johnson and the City of Greenville moved for summary judgment on all of the Ramberts' claims against them on the grounds that there was no genuine issue of material fact as to "Defendants' qualified immunity defense and Defendants are therefore entitled to judgment as a matter of law." J.A. 156. The defendants below argued that "Plaintiffs cannot establish that there was a violation of any clearly established constitutional right. . . . Plaintiffs' other claims against Officer Johnson and the City also, therefore, fail." J.A. 475. Similarly, the district court denied the motion for summary judgment on the related state and federal claims based on its finding that Johnson was not entitled to qualified immunity. Both defendants appealed the district court's order predicated on qualified immunity and sought review of the district court's denial of summary judgment on the related state and federal claims. "But interlocutory review of a denial of qualified immunity does not automatically confer jurisdiction over other issues in a case." *Livingston v. Kehagias*, 803 F. App'x 673, 686 n.5 (4th Cir. 2020). Pendent appellate jurisdiction is only proper when an issue is inextricably intertwined with the decision to deny qualified immunity and consideration of those issues is necessary for meaningful review of the qualified immunity question. *See Bellotte v. Edwards*, 629 F.3d 415, 427 (4th Cir. 2011). In this case, while it may turn out that our decision today determines the outcome of some or all of the related state and federal claims, the record does not establish that the issues are inextricably intertwined or have to be resolved for us to meaningfully review qualified immunity. We therefore decline to exercise pendent appellate jurisdiction to review the related state law and federal claims and dismiss that aspect of the appeal for lack of jurisdiction. *See Evans v. Chalmers*, 703 F.3d 636, 658–59 (4th Cir. 2012); *see also Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014) ("Unlike public officials, municipalities do not enjoy qualified immunity. Accordingly, claims against municipalities are measured against current law, without regard to whether municipalities' obligations were clearly established at the time of the alleged violations." (internal citation omitted)).